CHARLES A. BONNER, ESQ.  SB# 85413
A. CABRAL BONNER, ESQ. SB# 247528
LAW OFFICES OF BONNER & BONNER
475 GATE FIVE RD., SUITE 211
SAUSALITO, CA 94965
TEL: (415) 331-3070
FAX: (415) 331-2738
cbonner799@aol.com
cabral@bonnerlaw.com

ATTORNEYS FOR PLAINTIFF
KIMBERLY BRYANT

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KIMBERLY BRYANT, an individual; | **Case No.  3:22-cv-04643** |
| **Plaintiff,** | |
| vs. | **FIRST AMENDED COMPLAINT/ ORDER TO SHOW CAUSE** |
| BLACK GIRLS CODE, a California Non-Profit Public Benefit Corporation; HEATHER HILES, an individual; STACY BROWN-PHILPOT, an individual, SHERMAN WHITES, an individual; SOFIA MOHAMMED; WELLS FARGO & COMPANY, CHARLES W. SCHARF, MICHAEL P. SANTOMASSIMO, and DOES 1-50, Inclusive.  **Defendants.** | **(1)   NEGLIGENCE** **(2)   VIOLATION OF RIGHT TO FINANCIAL PRIVACY ACT** **(3)   INVASION OF PRIVACY-CALIFORNIA CONSTITUTION ART 1 SEC 1** **(4)   WHISTLEBLOWER LIABILITY CALIFORNIA LABOR CODE § 1102.5** **(5)   NEGLIGENCE PER SE** **(6)   INTRUSION UPON SECLUSION** **(7)   CONSPIRACY** **(8)   TORTIOUS INTERFERENCE WITH BUSINESS PROSPECTIVE** **(9)   TORTIOUS INFERENCE WITH BUSINESS ADVANTAGE** **(10) FAILURE TO PREVENT HARASSMENT AND RETALIATION** **(11) WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY** **(12) VIOLATION OF CALIFORNIA CORPORATIONS CODE §5233** **(13) REQUEST FOR ORDER TO SHOW CAUSE** |

PLAINTIFF KIMBERLY BRYANT alleges as follows:

**INTRODUCTION**

1.      Defendants, and each of them, conspired to take over Plaintiff Kimberly Bryant's non-profit corporation, Black Girls Code, that she founded in 2011. Defendants have wrongfully removed and excluded Ms. Bryant from Black Girls Code, and wrongfully transferred to themselves her sole proprietor Wells Fargo bank accounts without her consent, knowledge and over her objection. Defendants' fraudulent and illegal acts and conduct has caused, and continue to cause Ms. Bryant irreparable injury, damage, and harm where money damages are an inadequate remedy.  Hence, Ms. Bryant respectfully moves this Court by an order to show cause seeking injunctive relief in order to prevent the continuance of irreparable injury, damage and harm.

**PARTIES**

2.      Plaintiff Kimberly Bryant ("BRYANT" or "Plaintiff") is the founder and Chief Executive Officer and past member of the Board of Directors of Defendant BLACK GIRLS CODE ("BGC"), a California non-profit corporation. BRYANT created BGC's concept and vision and funded its startup from her own 401K in 2011.

3.      On behalf of the People of California, Attorney General Rob Bonta is charged with the primary responsibility of ensuring that charitable trusts and public benefit corporations, "compl[y] with [their] trusts and articles of incorporation, and for protecting assets held by charitable trusts and public benefit corporations." (Gov. Code, § 12598.) In the name of the People, the Attorney General is authorized to enforce the provisions of the Supervision of Trustees and Fundraisers for Charitable Purposes Act (Gov. Code, § 12580 et. seq.), the Nonprofit Corporation Law (Corp. Code, § 5000 et seq.), and those provisions of the Business and Professions Code that prohibit unlawful, unfair, and fraudulent business practices (Bus. & Prof. Code. § 17200 et seq.). On or about January 11, 2022, Attorney General Bonta was informed of BRYANT's intention to file her initial Complaint and is now hereby requested to intervene in this action as an indispensable party pursuant to Corporations Code Section 5233.

**Defendants**

4.      Defendant BGC is, and at all relevant times, was a California non-profit public benefit corporation organized under the laws of the State of California and according to its filings with the California Secretary of State, its principal place of business is Oakland, California. BGC was established

2

to provide technical education and training in computer programming and technology to disadvantaged and underserved inner city young girls. Since 2011, BGC has chapters in 16 cities and its programming training has reached more than 30,000 participants.

5.     Defendant Heather Hiles ("HILES") is a resident of the State of Florida and is a member of BGC's Board of Directors. She currently serves as the Treasurer and Interim Chair of the Board. At all times relevant HILES owed a fiduciary duty of care and loyalty to BGC and its charitable beneficiaries. Individually and with others, HILES has formulated, directed, controlled, and/or participated in the acts and practices of BGC as set forth herein.

6.     Defendant Stacy Brown-Philpot ("BROWN-PHILPOT") is a resident of the State of California and is a member of BGC's Board of Directors. At all relevant times, BROWN-PHILPOT owed a fiduciary duty of care and loyalty to BGC and its charitable beneficiaries. Individually and with others, BROWN-PHILPOT has formulated, directed, controlled, and/or participated in the acts and practices of BGC as set forth and alleged herein.

7.     Defendant SHERMAN WHITES ("WHITES") is a resident of the State of Missouri and is a member of BGC's Board of Directors. At all relevant times, WHITES owed a fiduciary duty of care and loyalty to BGC and its charitable beneficiaries. Individually and with others, WHITES has formulated, directed, controlled, and/or participated in the acts and practices of BGC as set forth and alleged herein.

8.     Defendant SOFIA MOHAMMED is a resident of the State of Mississippi. At all times relevant times, MOHAMMED was wrongfully appointed by Defendant Heather HILES as the CEO of BGC and owed a fiduciary duty of care and loyalty to BGC and its charitable beneficiaries. Individually and with others, MOHAMMED has formulated, directed, controlled, and/or participated in the acts and practices of BGC as set forth and alleged herein.

9.     BLACK GIRLS CODE, a California non-profit public benefit corporation, HEATHER HILES, an individual, STACY BROWN-PHILPOT, an individual, SHERMAN WHITES, an individual, SOFIA MOHAMMED an individual, and DOES 1 through 50 are sometimes referred to herein as the "Black Girls Code Defendants."

10.     Defendant WELLS FARGO is a Delaware corporation with principal executive offices located at 420 Montgomery Street, San Francisco, California 94104. WELLS FARGO's common stock

trades in an efficient market on the New York Stock Exchange ("NYSE") under the trading symbol "WFC".

11.     Defendant Charles W. Scharf ("SCHARF") has served as Wells Fargo's Chief Executive Officer and President at all relevant times.

12.     Defendant Michael P. Santomassimo ("SANTOMASSIMO") has served as Wells Fargo's Senior Executive Vice President ("EVP") and Chief Financial Officer at all relevant times.

13.     Defendants Wells Fargo Bank, SCHARF, SANTOMASSIMO, Santos, and Sanchez are sometimes referred to herein as the "Wells Fargo Defendants."

14.     Wells Fargo & Company "Wells Fargo Bank" is an "insured depository institution" as that term is defined in 12 U.S.C. § 1813(c)(2). The Bank is a "national banking association" within the meaning of 12 U.S.C. § 1813(q)(1)(A).

15.      WELLS FARGO is a diversified financial services company that provides banking, investment, mortgage, and consumer and commercial finance products and services in the U.S. and internationally.

16.     In connection with the acts alleged in this complaint, DEFENDANTS, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets when engaging in conduct that constitutes the harms alleged herein.

17.     PLAINTIFF is unaware of the true names and capacities of the defendants sued as DOES 1 through 50, inclusive, and therefore Plaintiff sues those defendants by fictitious names under section 474 of the California Code of Civil Procedure. Plaintiff will seek leave of the Court to amend this Complaint to allege the true names and capacities of DOES 1 through 50, inclusive, when the true names and capacities are ascertained. Plaintiff is informed and believes, and on that basis alleges, that each of the defendants named in this Complaint as DOES 1 through 50, inclusive, is responsible in some manner for the occurrence, injury, and other damages alleged in this Complaint.

18.     PLAINTIFF alleges that at all relevant times each named and unnamed defendant was the agent and/or employee of the other defendant, and at all times each defendant was and is acting within the purpose and scope of such agency and/or employment and with the permission and consent of his/her/its defendants and with knowledge, authorization, permission, consent, and/or subsequent

ratification and approval of each defendant. Plaintiff further alleges that each named and unnamed defendant knowingly and willfully conspired and agreed among themselves to deprive Plaintiff of her rights and to cause the damages described below.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 12 U.S.C.S. § 3401, a federal question.

20.     Venue is properly situated in the Northern District of California as Defendant WELLS FARGO is headquartered in said District, BGC DEFENDANTS conduct business in this District, and a significant portion of Defendants' activities took place within this Judicial District. Whenever reference is made in this Complaint to any act of any corporate or other business defendant, such allegation shall mean that said defendant, and its owners, officers, directors, agents, employees, or representatives did or authorized such acts while engaged in the management, direction, or control of the affairs of Defendants and while acting within the scope and course of their duties, unless otherwise alleged.

21.     Whenever reference is made in this Complaint to any act of any individual defendant, such allegation shall be deemed to mean that said defendant is and was acting (a) as a principal, (b) under express or implied agency, and/or (c) with actual or ostensible authority to perform acts so alleged on behalf of every other defendant.

22.     BGC, its executive officers and members of the Board of Directors are governed by the BGC Bylaws, duly adopted on February 8, 2017

23.     Members of the BGC Board of Directors are also bound by a "Board Member Agreement," which each member has executed acknowledging the shared responsibilities of the Board and the conduct expected of all Board members.

## STATEMENT OF FACTS

### BGC Thrives on Substantial Donations

24.     Since approximately 2011, BRYANT has spearheaded efforts to provide access to technology and technological training to underprivileged girls of color through BGC. BRYANT, who initially funded BGC from her own 401K account, is an electrical engineer who has led and served as BGC's CEO since its formation. Under BRYANT's leadership, BGC has provided over 30,000 young women with access to skills in computer programming and technology through BGC classes taught by

over 4,000 volunteers. BRYANT has been at the forefront of the movement to open the 'tech world' doors to Black girls who have long been left out of that industry. BRYANT is a respected thought leader and one of the less than 1% women of color who led nonprofit organizations in the area of tech education and/or other peripherally related ecosystems. She is a well acknowledged and respected global and Silicon Valley leader, who has dedicated herself to the founding, growth, and expansion of BGC from a single chapter in the Bay Area to 15 chapters in major cities across the US and South Africa, including a second headquarters in New York City sponsored by Google.

25.     As an organization, BGC has grown from a grass-roots level non-profit organization that has received approximately $6,500,000 in donations through 2019 to an exponentially expanding organization that had received more than $30,000,000 in funding by the close of 2020. During the pandemic, BRYANT led BGC through an unprecedented shift to virtual programming that allowed the organization's student reach to expand exponentially. This resulted in BGC reaching over 10,000 students in 2020 alone, while doubling its staff and experiencing a 1,000 percent increase in revenue. BGC is now an internationally recognized non-profit due to generous public gifts and on account of strategic corporate partnerships which have positioned BGC to continue to grow well into the future.

**HILES Takes an Interest in BGC for her Personal Benefit**

26.     Concurrent with the success and notoriety that BGC obtained on account of the influx of generous funding and donations through 2021, HILES took a keener interest and a more active role on BGC's Board. Unbeknownst to BGC and BRYANT, HILES was eager to salvage her professional reputation. HILES, the first President of Calbright College, was forced to resign in 2020 following the failure of Calbright's first state audit amidst findings of mismanagement, cronyism, and potential fraudulent use of state funds. Following her resignation, HILES sought to defend her reputation by candidly admitting that "[i]t is easy to blame the founding CEO for everything..."

27.     Following BGC's exponential increase in charitable donations during and following the pandemic, HILES became more active in their role as a director. Upon information and belief, BRYANT alleges that HILES sought to capitalize on BGC's growth and increased funding for her own personal gain. BRYANT is informed and believes that since approximately September of 2020, HILES has been a director at Udemy, a global marketplace for learning and online education.

28.     In or about August 27,2020, HIILES sent a text message to BRYANT, stating that she

had joined the Board of Udemy, and that Udemy was pre-Initial Public Offering ("IPO"). At some point following HILES' text message, BRYANT looked at the regulatory filings for Udemy and confirmed that HILES was a paid Board member and that Udemy was poised to move for IPO status.

29.     In or about February 16, 2021, in connection with preparing for Udemy's IPO, HILES attempted to arrange a partnership between BGC and Udemy.  In response and on that same date, BRYANT, in the presence of Defendant BROWN-PHILPOT, repeatedly warned and emphasized to HILES of the impropriety of HILES' attempt to arrange a partnership between BGC and Udemy. BRYANT reminded HILES that BGC was already pursuing and engaged in a partnership with Udemy's closest competitor, Coursera. HILES was relentless in her insistence that BGC engage in partnership with Udemy since the company sought to go public in the forthcoming year stating, "this would be good for Udemy".  BRYANT repeated her objection to HILES' attempt to engaged BGC in a partnership with Udemy, expressly asserting that such a partnership would be an illegal conflict of interest because HILES was a paid Board member of Udemy.  As a result of HILES' unrelenting inducement directed at BRYANT and other BGC staff regarding the 'necessity' of BGC partnering with Udemy, BRYANT objected to HILES' nomination as BGC's interim chair based upon concerns with HILES' lack of ethical standard concerning her inability to refrain from engaging in self-dealing and in her disregard of a glaringly apparent conflict of interest.

30.     BRYANT further alleges on information and belief that HILES intentionally impeded BGC's establishment of a $20,000,000 endowment which was fully approved by the Board in June 2021. Although the endowment could have been implemented by the late spring or early summer of 2021, HILES unilaterally impeded the establishment of the endowment. As acting Treasurer and interim Chair of the Board, HILES refused to follow through with the Board's June 2021 Resolution to fund the endowment. BRYANT alleges on information and belief that the purpose of the delay was on account of HILES intention to divert the endowment funds to a venture capital firm which again, HILES had a personal financial interest in as then acting managing partner. During the course of several meetings with principals of WestFuller, HILES made a "soft pitch" to the partners at WestFuller. Nevertheless, BRYANT again objected to HILES blatant conflict of interest and self-dealing. Following the meeting with the principals of WestFuller, Lola West and Ian Fuller, HILES still refused to complete the final signatures necessary for moving the investment forward for the endowment by referring to the necessity

of an additional vote by the BGC board although this particular measure had already been approved by the BGC Board in June. When BRYANT pointed out that the full Board had unanimously approved the establishment of the endowment in June which was affirmatively reflected in the Board's minutes from the June meeting, HILES finally relented and gave her "approval" to move forward on November 12, 2021.

31.     However, on account of BRYANT's subsequent suspension initiated and instigated by HILES and members of a self-appointed special committee just a few weeks following this interaction, the transfer of funds to the endowment account was obstructed and did not occur. HILES achieved her intended result.

32.     On October 5, 2021, BRYANT further objected to HILES simultaneously acting as Treasurer and serving as interim Chair of the Board. BRYANT asserted HILES' conduct was in violation of Corporation Code Section 5213 which provided that "Any number of offices may be held by the same person unless the articles or bylaws provide otherwise, except that no person serving as the secretary, the treasurer, or the chief financial officer may serve concurrently as the president or chair of the board." In direct response to this and other additional objections by interjected by BRYANT, HILES embarked on an unrelenting campaign of retaliation and harassment against BRYANT, including the engineering and implementation of BRYANT's suspension and termination from the Board and both her removal as CEO and termination of her employment.

33.     In perpetuating her campaign of retaliation against BRYANT, HILES manipulated the resignation letters of two employees who were steered in the direction of blaming BRYANT as its cause.

34.     Over the summer months of 2021, two employees—Isis Miller and Anesha Grant-- of BGC resigned and expressed concerns over BGC's workplace culture. There specific allegations were that BGC's workplace culture was "toxic". In response to the resignations, BRYANT, in July of 2021, immediately convened a Board meeting to discuss the specific concerns raised by the two employees. On July 1, 2021, at 1:13 pm Isis Miller ("Miller") sent a resignation letter directly to the Board. On the same day, July 1, 2021, at 2:00 pm, Anesha Grant ("Grant"), Isis Miller's supervisor, sent a resignation letter to BRYANT but then, after an unauthorized private meeting between HILES, Grant and Miller, Grant sent a revised and much longer resignation letter to the Board that now included many of the

complaints raised by Miller's letter that had been absent from the first letter sent to BRYANT. Upon information and belief, HILES was integral in assisting Anesha Grant in drafting her amended letter of resignation to the Board.

35.     On July 2, 2021, at an emergency BGC Board meeting, HILES admitted that she had reached out and met with Miller and Grant without Board approval. HILES, who as a Board member required to adhere to BGC's internal policies, was neither tasked nor permitted to speak with resigned personnel and was reprimanded for her actions by then Board chair, Dr. Stephanie Adams. Despite expressly violating BGC internal policies, HILES refused to divulge to the Board the specifics of her conversations with Miller and Grant, but instead, deflected attention away from herself and before the entire Board, disparaged BRYANT's character and her ability to sufficiently lead BGC in the future. Since Miller had made allegations in her resignation letters that BRYANT had "mis-gendered" her by referring to her as "she" instead of "they," a reasonable inference existed that HILES' blatant hostility against BRYANT suggested that HILES' wholly supported and affirmed Miller's allegation of mis-gendering on account that such allegation was lacking any additional evidence other than Miller's testimony to support such a claim.

36.     During the meeting HILES was admonished for her conduct by Board chair, Dr Stephanie Adams and on account of HILES display of partiality, the Board agreed that it would explore the potential of hiring an independent investigator to conduct an employee survey to determine the veracity and extent of Miller and Grant's allegations. Thereafter BRYANT met with Board members, including former Board Chair Dr. Stephanie Adams, to discuss the personnel issues raised by the July 2021 resignations. At that time, BRYANT and Dr. Adams agreed that the issues presented by the resignations did not warrant involvement of legal counsel, but that BGC should still conduct the staff survey as previously discussed. HILES and BROWN-PHILPOT, however, raised strong opposition to the decision made by Dr. Adams and requested that the Board meet anew to discuss the issues.

**HILES Uses Employee Resignations to Oust BRYANT**

37.     Over the summer months of 2021, three employees of BGC resigned over expressed concerns with BGC's workplace culture. In response to the resignations, BRYANT, in July of 2021, convened an emergency meeting of the Board to discuss the concerns raised by the resigning employees.

38.     At this meeting BRYANT proposed that BGC take immediate action to improve BGC's

workplace culture, including the hiring of a cultural consultant and a Chief Strategy Officer to improve BGC's efforts of remediating BGC's workplace environment. On or about October of 2021, BGC did in-fact hire Karla Monterroso, the former CEO of the racial equity non-profit Code2040 as a special consultant to evaluate the inner workings of BGC. BRYANT also met with Edgility Consulting to launch an initiative to improve staff compensation and to provide coaching and mentorship to the senior leadership.

39. On or about September 22, 2021, Dr. Adams resigned from her role as BGC Board Chair which subsequently left a vacancy seat on the Board. HILES immediately and aggressively began campaigning to succeed Dr. Adams as Board Chair, despite holding the position as acting Treasurer which according to BGC bylaws precluded her from holding both positions simultaneously.

40. On or about September 28, 2021, BRYANT received a memorandum purportedly from the BGC Board sent from Board member Sherman Whites requesting immediate information from BGC's legal counsel as to the insurance policies provided for BGC's Directors and Officers, as well as clarification of the official communications between BGC and the employees who resigned in July, 2021. This communication precipitated a slurry of email communications between BRYANT and other members of the Board including SHERMAN WHITES, HEATHER HILES, and STACY BROWN-PHILPOT, who endeavored to install HILES (although she was currently serving as BGC Board treasurer), as the interim Board chair by vote over email. BRYANT responded that pursuant to the bylaws, a formal meeting was required on the issues raised and in answer to the Board's queries responded that (1) Loeb & Loeb, LLP was BGC's legal counsel, (2) BRYANT would provide the insurance policy requested, and (3) it had already been determined that the employee resignations did not warrant the involvement of legal counsel. BRYANT further requested a formal meeting of the Board to elect a new Board Chair, which was vacant due to the resignation of Dr. Adams.

41. On or about October 5, 2021, a special Board meeting was convened by Board member SHERMAN WHITES. Prior to this meeting BRYANT sent a memorandum to her fellow Board members outlining her concerns regarding HILES conduct and demeanor including intentionally violating Board bylaws and protocols, workplace bullying, self-dealing, conflict of interest, and other workplace misconduct. BRYANT requested to read allowed the contents of the memorandum at the start of the Board meeting which did in fact occur over HILES' objection. The memorandum set out additional

10

details of HILES misconduct and self-dealing.  Nevertheless, despite BRYANT's strenuous objections, HILES was nominated for the interim Board Chair by SHERMAN WHITES and seconded by STACY BROWN-PHILPOT. Now serving unlawfully as both BGC's Treasurer and Chair of the Board, HILES indicated that she was going to create a "Special Committee" comprised of HILES, BROWN-PHILPOT, and WHITES to investigate "employee workplace concerns." No vote was taken with respect to the creation of a "Special Committee" despite such was required prior to its commencement.

42.     BRYANT alleges upon information and belief that at some point on or about October of 2021, the Board held a meeting without proper notice and in violation of the BGC bylaws that specifically excluded BRYANT, who as CEO, had been serving as the Board's President. At that unauthorized October 2021 meeting, a "Special Committee" was formed consisting of Defendants, HILES, BROWN-PHILPOT, and WHITES, with the express purpose of inquiring into employment and human resources matters. It was understood that the Special Committee would report back to the full Board with its findings and recommendations. BRYANT further alleges that, prior to the unauthorized meeting promulgating the creation of a Special Committee, HILES had independently consulted with Holly Lake, an attorney associated with the law firm DLA Piper who was in attendance at the unauthorized meeting despite the fact that the firm had not yet been contractually engaged by BGC which was a requirement prior to consultation. Thereafter, Board member STACY BROWN-PHILPOT, in acting on behalf of the Special Committee, strong armed BRYANT into agreeing to retain DLA Piper as legal counsel on "employment related issues." BRYANT however was unaware nor was she notified that DLA Piper was tasked with conducting an investigation into allegations of BRYANT's own workplace misconduct.

43.     Around the time of the formation of the Special Committee in October of 2021, BRYANT had formally requested that HILES be investigated for workplace misconduct in connection with a meeting of the Board of Directors on July 2, 2021. During the July 2, 2021 Board meeting, HILES verbally assaulted BRYANT and was reprimanded by Board chair, Dr. Stephanie Adams for her inappropriate conduct. On account of BRYANT's attempt to thwart HILES from engaging in self-dealing, as well as HILES threatening remarks to BRYANT, significant tensions arose between HILES and BRYANT. BRYANT alleges on information and belief that the Special Committee did not decide to investigate HILES's conduct at the July 2, 2021 Board meeting, as HILES, who spearheaded the

Special Committee, was not inclined to investigate herself.

44.     Up until December 8, 2021 when HILES directly contacted BRYANT's Chief of Staff and demanded that certain employee personnel information be immediately provided to HILES, BRYANT had no communication with the Special Committee, nor with any attorney from DLA Piper or any "investigator" retained through the Special Committee. After receiving HILES demand request, BRYANT informed HILES that she needed to speak with BGC counsel to discuss the legality of sharing personnel information and whether it was permissible to disclose the requested information. In addition, BRYANT attempted to engage outside counsel to further determine the legalities of providing confidential personnel files to the Special Committee. Such attempt was unsuccessful as outside counsel was unavailable.

45.     Upon confirmation of Board member availability, a Board meeting was scheduled for December 20, 2021 to approve BGC's 2022 budget. Leading up to the December 20, 2021 meeting, HILES repeatedly made attempts to cancel the meeting, including up until the very morning of the meeting, December 20, 2021.

**BRYANT is Suspended as CEO Without a Vote of the Board**

46.     On or about December 20, 2021, a special and properly noticed meeting of the Board was held. BRYANT, HILES and other members of the Board were in attendance. Following the meeting, HILES requested to meet privately with BRYANT. BRYANT informed HILES that she could not meet at that the requested time due to a number of pre-existing obligations but asked BRYANT to reschedule a meeting through her assistant. In following up with BRYANT's assistant to reschedule the meeting, HILES insisted that BRYANT meet alone with all three members of the Special Committee (HILES, BROWN-PHILPOT, and WHITES). BRYANT responded that she was uncomfortable meeting with the Special Committee without the presence of counsel. BRYANT informed HILES that although she had a previously scheduled meeting with counsel on Tuesday, December 21, 2021, she was uncertain whether it would be possible for her counsel to call in for a meeting with the Special Committee. BRYANT suggested that the meeting be rescheduled in January 2022 after the holiday season.

47.      On or about the morning of December 21, 2021, BRYANT's corporate email and access to BGC's internal portals was disabled. When BRYANT reached out to her chief of staff, LaShonda Polite to inquire about her inability to access her corporate accounts, she was told that HILES had directly

contacted Ms. Polite to inform her to discontinue communication with BRYANT directly and that BRYANT was suspended indefinitely. Later in the afternoon, around 4:00 p.m., BRYANT received an email from HILES via BRYANT's personal email account, notifying her that she had been placed on indefinite suspension as CEO. The December 21, 2021 letter states that "[t]he Board of Directors have been made aware of serious allegations that involve you and we are attempting to conduct a thorough and robust investigation into those allegations. You have conducted yourself in a manner so as to disrupt and impede the ongoing investigation." The December 21, 2021 letter further notified BRYANT that Sofia Mohammed was named the interim Executive Director of BGC, and that "Counsel will reach out to you regarding the ongoing investigation, which you are required to cooperate with as an employee of BGC."

48.     In addition to being stripped of both her email and the ability to access corporate documents, BRYANT was also locked out of the BGC premises. BRYANT attempted to contact Sofia Mohammed but received no response. BRYANT attempted to contact her Chief of Staff, but BRYANT was informed that HILES had ordered a gag-order on all BGC personnel from communicating with BRYANT. HILES gag-order was initiated before BRYANT was notified of her suspension and that if said gag-order was violated, BGC personnel's employment would be terminated.

49.     BRYANT alleges that upon information and belief, the termination of her access to BGC email, internal documents, and BGC's premises was intentionally initiated by HILES as a calculated scheme to preclude BRYANT's ability to affirmatively prove that HILES had engaged and was engaging in self-dealing and conflict of interest. BROWN-PHILPOT was complicit in HILES ploy as she was made privy to HILES intention. BRYANT further alleges upon information and belief that she was kept from accessing email and corporate documents in order to prevent her from communicating with BGC's counsel about her upcoming meeting with the Special Committee and the Committee's predetermined intention to suspend her.

50.     Following the publication of BRYANT's suspension from BGC in the media, BRYANT was contacted by the law firm, Loeb & Loeb who was unaware that the BGC Board had taken any action to remove BRYANT and/or that the Board had authorized any investigation into BRYANT's alleged misconduct.

51.     BRYANT later learned, and alleges upon information and belief, that the full BGC Board

was unaware of any alleged misconduct by BRYANT prior to her suspension, and that the Special Committee, who was solely tasked with investigating various employment and HR issues, did not communicate **any** of its findings with the Board prior to her suspension. Nor did the BGC meet, discuss, or otherwise vote to remove BRYANT from her role as CEO. In fact, BRYANT's suspension was a complete surprise to many of the Board members, who only learned of BRYANT's suspension after such news was made public.

52.     BRYANT alleges on information and belief that the alleged "investigation" by BGC and the Special Committee was an unsubstantiated, untruthful and disingenuous pretext spearheaded by HILES to have BRYANT removed as CEO in order for HILES to obtain unfettered control over BGC operations. As such, HILES sought to orchestrate the means by which to implement her personal agenda of self-dealing and perpetuation of undisclosed conflict of interest.

53.     BRYANT further alleges on information and belief that Defendants' HILES, BROWN-PHILPOT, and WHITES had, under the guise of a "Special Committee,' acted independently of the Board of Directors in order to (1) suspend BRYANT and prohibit her from accessing company records and information (despite otherwise being entitled to as a matter of law), (2) keep BRYANT from communicating with BGC's counsel, and (3) to conduct an unauthorized investigation concerning BRYANT's alleged misconduct in an attempt to justify the removal of BRYANT as BGC's CEO.

54.     On or about January 10, 2021, in compliance with Corporations Code Section 5710 et seq., BRYANT sent correspondence to BGC and the BGC Board that apprised them of the allegations contained in this Complaint, as well as a draft copy of the instant Complaint to ensure that BGC was on notice of all material allegations alleged herein. BRYANT's correspondence to the Board was drafted in response to correspondence that she had received from BGC, dated January 7, 2021, which insufficiently responded to BRYANT's December 28, 2021 correspondence and requests of the Board..

**BGC Publicly Defames BRYANT**

55.      Following BRYANT's suspension, BGC has consistently repeated false, disparaging, and defamatory statements concerning BRYANT's alleged misconduct in the public forum. Once the news about BRYANT's suspension was made public, national news sources sought comment from BGC.

56.     BGC has repeatedly set forth a false narrative that BRYANT is being investigated for "serious allegation(s)" of misconduct. For example, when asked for comment from the news outlet

Business Insider, the BGC Board emailed a statement which stated in part, that BRYANT is still a BGC staff member but that "serious allegations of workplace impropriety are being investigated." In a separate statement to Business Insider, BROWN-PHILPOT stated that the Board was investigating "serious allegations of workplace impropriety."

57.     In addition, on or about December 24, 2021, the Special Committee (and not the entire BGC Board) released a public statement to BGC's partners and donors purporting to explain the circumstances surrounding BRYANT's suspension ("Special Committee Statement"). The Special Committee Statement read: "Earlier this year, the Board received or became aware of concerns raised by current and former employees about BRYANT's conduct. On or about October 5, the Board formed the Special Committee to review and evaluate the complaints and determine what, if any, action should be taken with respect to these concerns." The Special Committee Statement was issued and signed by HILES.

58.     After obtaining legal counsel, BRYANT issued a demand letter to BGC's counsel dated December 28, 2021 ("Demand Letter"), regarding the events leading up to BRYANT's suspension. The Demand Letter demanded, among other requests, that BGC produce all documents to which BRYANT is entitled pursuant to Corporations Code Section 6334. The Demand Letter further requested that BRYANT be immediately reinstated as CEO and that BGC refrain from further defamatory and disparaging public comment regarding the purported investigation into BRYANT's alleged and unsubstantiated misconduct. To date, BGC has failed to provide the records to which BRYANT is entitled as a matter of law and has otherwise failed to reinstate her access to emails and organizational documents.

59.     As a result of both BRYANT's suspension and public comments made by various representatives of BGC, BRYANT's opportunities and offers to speak at public engagements have precipitously declined despite having consistently received such offers prior to DEFENDANTS' unfounded assertions and insinuations. BRYANT is a prominent public speaker who has annually addressed private and public engagements with approximately twenty appearances per year.

60.     At the time of BRYANT's suspension, BRYANT was a finalist for selection as a director for a for-profit corporation. As a result of BGC's unlawful suspension, BRYANT has been informed that she is no longer a candidate for that director position.

61.     At the time that BGC announced to the general public that its Board was investigating "serious allegations of [BRYANT's]workplace impropriety," the Board had not yet actually commenced any formal or informal investigation BRYANT and/or her leadership of BGC.

**HILES Continues to Act Without Board Approval**

62.     Less than two weeks following BRYANT's wrongful suspension from BGC, HILES continued to act on BGC's behalf without obtaining the required approval from the BGC Board. On information and belief, HILES, purportedly under the authority of the Special Committee, began a campaign of unilaterally providing various BGC employees promotions and salary increases in a transparent attempt to garner favor with BGC employees and to differentiate her management demeanor from BRYANT's. On information and belief, beginning in January 2022, HILES, has exercised carte blanche authority over the approval of new executive hires and has unilaterally assumed operational control over organizational matters without consideration and oversight by the BGC Board. Such conduct is in blatant contravention of BGC's institutional policies and its bylaws.

58.   BRYANT alleges upon information and belief that HILES unilaterally ordered BGC's Vice president of Human Resources, Karla Tai, to increase the salary of BGC's interim Executive Director, Sofia Mohammed to the same  amount as BRYANT had been receiving as CEO. As such request occurred prior to the BGC Board receiving results of the investigation into allegations against BRYANT, such salary increase unequivocally demonstrates that HILES and BGC intended to remove BRYANT as CEO regardless of the findings of the purported investigation.

**BGC Wrongfully Removes BRYANT from BCG's Board and Wrongfully Terminates her Employment**

63.     <u>After</u> the Board suspended BRYANT from her position as BGC's CEO, and <u>after</u> the Board prematurely and falsely announced to the general public that it was investigating "serious allegations of workplace impropriety," the Board finally retained an outside lawyer, Aisha Adams ("Adams"), to investigate allegations concerning BRYANT and her leadership of BGC.

64.     Adams interviewed approximately 25 current and former BGC employees regarding BGC workplace and culture between March 2022 and July 2022. BRYANT agreed to voluntarily meet with Adams and as such, sat through four separate one hour interview sessions with her in July 2022.

65.     On August 12, 2022, the Board held a special Zoom meeting to allegedly review the

results of the internal investigation and to review BGC financial performance. The Board summarily refused to share organizational financial documents with BRYANT. Instead of addressing the previously decided agenda items, the Board was confronted with a request by Board member PHILPOT to immediately convene a vote on BRYANT's removal as a BGC board member. PHILPOT addressed the Board with a prepared resolution moving to formally remove BRYANT as a Board member before addressing any of the items on the meeting's agenda. When BRYANT objected to BROWN-PHILPOT's motion and asked for clarification on why she was being removed from the Board, BROWN PHILPOT declared that it was for the "good of the organization."

66.     BRYANT insisted that the results of the investigation be shared with the Board before moving forward with BROWN PHILPOT's motion and subsequent vote in order to ensure that all Board members were apprised of the results of the investigation. Such was imperative as the "Special Committee" affirmatively asserted that no one had been made privy to the results of the investigation up to that point. In contravening Board protocol by withholding information that was imperative for rendering a reasonably informed vote, the "Special Committee" arrived at the meeting with a detailed, pre-drafted resolution in hand to remove BRYANT.

67.     As a sitting BGC Board member, BRYANT had a contractual right under BGC's Bylaws to cast a vote on her removal and/or termination as had all BGC Board members. Indeed, BGC confirmed this right by providing BRYANT with notice of the Board's special meeting and log-in credentials for the special meeting's Zoom session.

68.     BRYANT was present over Zoom for the beginning of the August 12, 2022 special meeting. However, HILES and BGC's counsel required that BRYANT be temporarily excluded from the meeting while Adams presented the BOARD with her investigative findings. BRYANT protested her removal but was removed from the Zoom session by HILES.

69.     In BRYANT'S absence, Adams presented the BOARD with her investigative findings. Adams informed the BOARD as to the specific allegations levied against BRYANT, including the unsubstantiated allegations pertaining to BRYANT's mismanagement and mistreatment of employees.

70.     During Adams' presentation, members of BGC's Board communicated with each other through Zoom's chat feature. Several Board members stated that they were unaware of any direct allegations made against BRYANT and/or that Adams had been hired to conduct a formal investigation

that examined more than 26 current and former BGC staff members and consultants.

71.     BRYANT learned of these chat communications as they occurred from members of the BGC Board who were in attendance and were participating in the special meeting. BRYANT informed her legal counsel, who immediately sent BGC'S counsel (who was also participating in the special meeting over Zoom) an e-mail demanding that all Zoom chat communications (including those relating to the investigation) be preserved.

72.     At the end of Adams' presentation, the Board voted on BRYANT'S removal from the Board and her termination as CEO. The Board was well aware that BRYANT was excluded from the Zoom call but made no attempt to make contact with her or her counsel to allow her to rejoin the call-in order to cast her vote. The Board was also aware that BRYANT was waiting to rejoin the main session by, among other things, the fact the Board's counsel received a contemporaneous e-mail from BRYANT'S counsel discussing events taking place during the meeting. Nevertheless, BGC refused to permit BRYANT to rejoin the Zoom session where the vote on her removal and termination were taking place. BGC's Board voted 3-2 to remove BRYANT's Board appointment and to terminate her employment. As was her right under BGC's bylaws, had BRYANT been able to participate in the vote, she would not have been removed as a Board member or terminated as BGC's CEO.

**BGC Continues to Retaliate Against Bryant After her Removal and Termination.**

73.     Despite DEFENDANT'S most egregious, illegitimate and reprehensible conduct as articulated above, BGC and DEFENDANTS continue their wrongful campaign of harassment and retaliation against BRYANT even though she is no longer a Board member or employee.

74.     On account of DEFENDANTS' wrongful termination, BRYANT lost her family's health insurance. Under relevant federal and California law, BGC was required to give BRYANT statutory notice of her right to COBRA and Cal-COBRA continuation coverage within 14 days of her August 12, 2022 termination. Despite repeated inquires by BRYANT, BGC initially refused to provide BRYANT statutory notice of her right to continued coverage. BRYANT only received such notice on September 20, 2022, some thirty-nine days after her purported termination.

75.     In addition, BRYANT was denied the proper distribution of her remaining vacation days. In a memo from BGC VP of Human Resources, Karla Tai, BRYANT was informed that her final pay would include a randomly generated three weeks of vacation. When BRYANT contested the accuracy

18

of vacation pay calculation, Ms. Tai responded with an updated and increased distribution which was still incorrect as to the amount due BRYANT.

76.    On August 22, 2022, BGC filed a baseless federal lawsuit in the Northern District of California entitled BGC v. Kimberly Bryant and Doe 1, Case No. 3:22-CV-04801-JSC. In that lawsuit, BGC accused BRYANT of hacking into a server containing BGC's website code, content, and other components and damaging and/or deleting these items resulting in the disablement of BGC's website. Such allegations are unfounded as BRYANT did not have access to BGC's website files and did not delete or destroy any of the website's components. The BGC website was, and remains, perfectly functionable. Indeed, BGC was forced to amend its complaint when faced with indisputable proof that its website was not disabled by any wrongful conduct by BRYANT.

77.    BGC'S continued harassment and retaliation has and will continue to significantly damage BRYANT. Among other things, BRYANT has lost multiple lucrative speaking engagements as a result of BGC's wrongful accusations and termination. Moreover, BRYANT has been forced to incur substantial attorneys' fees and expenses defending against BGC's frivolous federal lawsuit.

## FIRST CAUSE OF ACTION
### NEGLIGENCE
#### (*Against All Defendants and Does 1-50*)

78.    BRYANT incorporates the allegations asserted above and re-alleges them as though repeated in full in this cause of action.

79.    At all relevant times Officer/Director Defendants voluntarily undertook the duties and responsibilities of directors and/or officers of BGC without being formally elected or otherwise appointed pursuant to the protocols required under BGC Bylaws. Nevertheless, the voluntary undertaking of these duties and responsibilities created a duty on the part of these Defendants to exercise due care in the performance of those duties and responsibilities.

80.    The Officer/Director Defendants, including HILES, BROWN-PHILPOT, WHITES, and Does 1-50 breached the duty of care they owed to BGC by committing the actions and omissions set forth above, and committing other actions and omissions of which BRYANT is currently unaware.

81.    BRYANT is informed and believes and thereon alleges that, as a proximate result of the breach of the duty of care which the Officer/Director Defendants, including HILES, BROWN-

PHILPOT, WHITES, and Does 1-50 legally owed to BGC, including but not limited to, the unauthorized increase(s) in salary to employees and other payroll modifications, charitable assets have been improperly diverted from BGC. BGC and the public beneficiaries of the charity have been damaged in an amount presently unknown and which cannot be ascertained without an accounting by Defendants. The facts necessary to ascertain the exact amount of damages to BGC and its public beneficiaries are within the special knowledge of these defendants. BRYANT and/or the Attorney General are entitled to an accounting from Defendants including the disposition of all income and assets which have been improperly diverted from BGC or otherwise squandered through their breach of the duty of care or other wrongful acts.

**Wells Fargo Bank Defendants Facts and Claims**

82.     On or about January 24, 2012, BRYANT opened a Wells Fargo Bank Account by signing a "signature card" as the only and sole signatory on the account for her unincorporated sole proprietorship organization identified on the signature card as follows:

KIMBERLY BRYANT
BLACK GIRLS CODE
1725 WASHINGTON ST APT 11
SAN FRANCISCO, CA  94109

On or about January 24, 2012, the Wells Fargo manager Adam Qadeer requested and obtained an IRS EIN number for BRYANT's sole propriety account and emailed the EIN number to her, identified on his email as follows:

**Business Banker**
**Wells Fargo Bank, N.A.**
**1560 Van Ness Ave**
**San Francisco, CA 94109**
**MAC A0189-011**
**(415) 396.4595 Main**
**(415) 292.7831 Fax**
**Adam.A.Qadeer@Wellsfargo.com**

The IRS issued the EIN Number as follows:

Date of this notice: 01-25-2012
Employer Identification Number: 45-4347283
BLACK GIRLS CODE
1725 WASHINGTON ST APT 11

SAN FRANCISCO, CA  94109

83.     BRYANT started BGC as an organization with a small pilot program in 2011. In the fourth quarter of 2012, BRYANT recognized that she could scale and grow BGC to further manifest her mission of offering Black women opportunities to contribute to the promises of technology. As such, she incorporated the organization in San Francisco in January/February 2012.

84.     In 2018, BRYANT selected the current Board and at that time, BGC had a tremendous number of clients, i.e., Black girls who had enrolled in her program at the approximately 10 active chapter programs in different cities including the California Bay Area, New York. Houston, Dallas. Los Angeles, Washington, D.C., Raleigh, North Carolina. Boston. Miami, Florida. Detroit. Chicago. Atlanta, Georgia and Johannesburg. In 2018, BGC had an annual budget of between $2.5 to $4 million dollars.

85.     On or about December 21, 2021 Defendant Board members suspended BRYANT from her position as President of the Board and CEO of the organization upon publishing to the world, malicious and false allegations that BRYANT had engaged in "gross misconduct" and that the "Board was investigating gross misconduct" regarding the creation of a "hostile work environment" by "misgendering" a staff member, i.e., referring to the staff member with the pronoun "she" instead of "they." All the published allegations were intentionally false and a pretext for the theft of her Organization and her Wells Fargo bank accounts all for Defendants' personal gain.

86.     On or about February 5, 2022, Defendants, and each of them, conspired to transfer and did transfer BRYANT's Wells Fargo Account which was expressly a sole proprietorship account as BRYANT had never changed the signature card to reflect BGC'S non-profit incorporation. Wells Fargo Defendants failed to notify BRYANT of this transfer and theft of her account, nor did Wells Fargo Defendants obtain BRYANT's consent to transfer her account nor to provide access to Defendants. The BGC Board Special Committee was aware that the Wells Fargo account was still designated as a sole proprietorship account. Such was affirmed and asserted by WHITES during the January 21, 2022 Board meeting. During the same meeting HILES threateningly informed BRYANT "they were coming after the bank account and corporate AMEX account" despite knowing that the entirety was held in BRYANT's name under her social security number.

87.     Investigation of Defendant Wells Fargo policy and rules pertaining to transferring, and or making accounts accessible to persons other than those on the signature card holder shows that in

order to change the signature authority on a business account, the new signatories would need to produce a primary form of ID, e.g., a Driver's License and a secondary form of ID, e.g., a debit or credit card.  After the individuals' identity is established, the Bank would require the new signatories to sign the Bank's Addendum form called "Certificate of Authority."  Notice is then given to the original signature card holder of the account.

88.     On or about August 8, 2022, BRYANT visited the Wells Fargo bank and upon a request refused to provide her with her original signed signature card that she provided upon opening her BGC Account. The bank manager gave her a letter stating:

KIMBERLY BRYANT

Wells Fargo Bank
1560 Van Ness Ave
San Francisco Ca 94109

To whom this may concern:

During Mrs. Bryant's visit she requested for signature cards and records of Wells Fargo account we are unable to provide records currently and require additional research in order to provide any legal documents.

We are more then willing to contact our legal team within business banking hours and get back to Mrs., Bryant at a later time and date.

Dep Pham
Branch Manager
Wells Fargo Bank

89.     At present, the BGC Board has taken improper control of BRYANT's bank accounts and removed her access. The account contains approximately $38 Million of donated charitable funds which are no longer monitored and are in the Board's control who have expressed their desire to use the donated funds to invest in business ventures in which they have controlling interest. Currently, there is absolutely no oversight of the actions taken by the current board of directors.

90.     In or about July 2021, HILES embarked on a campaign of retaliation against BRYANT by initiating the suspension of BRYANT from her employment as BGC'S CEO. Meanwhile, HILES vigorously directed BGC  to engage in a business relationship with Udemy, an on-line educational resource business. BRYANT objected, citing that BGC was already in a business relationship with

Coursera, a direct competitor of Udemy, and to enter into the relationship with Udemy would create a conflict of interest given that HILES had a pre-existing financial interest in Udemy. Furthermore, HILES knew that Udemy had announced it was soon to file for IPO status.  On several occasions, BRYANT expressed her good faith concern that HILES was engaging in "self-dealing" which was in direct violation of State and federal laws, rules and regulations. Despite Board member BROWN-PHILPOT's knowledge that on account HILES' financial interest in Udemy, that BGC had a conflict of interest in contracting with Udemy, BROWN-PHILPOT chose to refrain from acting in the best interests of BGC. HILES and BGC Defendants, and each of them, retaliated against BRYANT by suspending her employment in violation of Labor Code section 1102.

91.     BRYANT did not give permission to Defendant Wells Fargo to release control of her account; Defendant Wells Fargo granted BGC Defendants access to her accounts without express permission as the account holder. On information and belief, BGC Defendants have spent over $2,000,000 of donors' funds since they suspended BRYANT. Hence, this Complaint specifically requests this honorable Court to issue an emergency Order to Show Caused directed to BGC Defendants to show caused why a Temporary Restraining Order should not issue to protect the donated funds and enjoin any and all BGC board meetings until further order of court and for an accounting of all donors' funds.

Wherefore, Plaintiff prays judgment as hereinafter set forth.

### SECOND CAUSE OF ACTION
### VIOLATION RIGHT TO FINANCIAL PRIVACY ACT
### (*Against Wells Fargo*)

92.     BRYANT incorporates the allegations asserted above and re-alleges them as though repeated in full in this cause of action.

93.     Defendant Wells Fargo violated BRYANT'S privacy as provided under the Right to Financial Privacy Act (RFPA), 12 U.S.C.S. § 3401 et seq., by breaching contractual obligations to BRYANT when transferring BRYANT's bank account, which was opened in BRYANT'S name and as a "sole proprietor" account, to the BGC Defendants. The RFPA prohibits the disclosure of records of a customer of a financial institution. Customers are defined as persons using the institution's services and is limited to individuals or a partnership of fewer than five individuals. 12 U.S.C. § 3401(4) and (5).

94.     Defendants illegal conduct was a direct and proximate cause of damage, injuries and harm to BRYANT, including, but not limited to economic and financial diminishment, pain, anxiety, mental and emotional distress, fear, humiliation, damage to self-image, damage to career, inconvenience, and suffering.

95.     Defendants illegal conduct was intentional, malicious and showed a conscious disregard of the rights and health of BRYANT entitling her to punitive damages against Defendants, and each of them, except BGC.

Wherefore, Plaintiff prays judgment as hereinafter set forth.

### THIRD CAUSE OF ACTION
### INVASION OF PRIVACY
### VIOLATION OF CALIFORNIA CONSTITUTION ART 1 SEC 1
### (*Against All Defendants*)

96.     BRYANT incorporates the allegations asserted above and re-alleges them as though repeated in full in this Cause of Action.

97.     California Constitution Article I Section 1 provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy.

98.     DEFENDANTS, and each of them at all relevant times knew that BRYANT enjoyed and had a reasonable expectation of privacy in her financial affairs, and especially in her BGC Wells Fargo bank account that she had worked diligently for years to grow for the benefit of BGC.

99.     WELLS FARGO intentionally intruded in on her right of financial privacy by fraudulently transferring her Wells Fargo bank account to Defendants BGC. Defendants' intrusion would be highly offensive to any reasonable person.

100.     DEFENDANTS illegal conduct was a direct and proximate cause of damage, injuries and harm to BRYANT, including, but not limited to economic and financial diminishment, pain, anxiety, mental and emotional distress, fear, humiliation, damage to self-image, damage to career, inconvenience, and suffering.

101.     Defendants illegal conduct was intentional, malicious and showed a conscious disregard of the rights and health of BRYANT entitling her to punitive damages against Defendants, and each of

them, except BGC.

Wherefore, Plaintiff prays judgment as hereinafter set forth.

**FOURTH CAUSE OF ACTION**
**WHISTLEBLOWER LIABILITY**
**VIOLATION OF CALIFORNIA LABOR CODE § 1102.5**
(***Against Employer BGC Defendants***)

102.     BRYANT incorporates the allegations asserted above and re-alleges them as though repeated in full in this Cause of Action.

103.     California Labor Code § 1102.5 states, in pertinent part:

(a) An employer may not make, adopt, or enforce any rule, regulation, or policy preventing an employee from disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation.

(b) An employer may not retaliate against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation.

(c) An employer may not retaliate against an employee for refusing to participate in an activity that would result in a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation.

(d) An employer may not retaliate against an employee for having exercised his or her rights under subdivision (a), (b), or (c) in any former employment.

(e) A report made by an employee of a government agency to his or her employer is a disclosure of information to a government or law enforcement agency pursuant to subdivisions (a) and (b).

104.     In or about July 2021, Defendants embarked on a campaign of retaliation against BRYANT by initiating her suspension as CEO. Defendant HILES was unrelenting in forcing the Board to undertake a business relationship with Udemy, an on-line educational resource business, despite the existence of her express conflict of interest. BRYANT objected to such relationship citing to the well acknowledged fact that (1) BGC was already in a business relationship with Cousera, a direct competitor of Udemy, and (2) that entering into a relationship with Udemy would create a clear conflict of interest given that Board member HILES held a pre-existing financial interest in Udemy. Furthermore,

Defendant HILES knew that Udemy had announced it was soon to engage in the IPO offering process. BRYANT voiced considerable concerns with HILES' proposal as she believed that in good faith, HILES was engaging in "self-dealing" that was in express violation of State and federal laws, rules and regulations. BRYANT voiced these concerns on multiple occasions both to individual director PHILPOT and to the full Board during the August 2021 Board meeting. HILES and BGC Defendants, and each of them, retaliated against BRYANT by suspending her employment in violation of Labor Code section 1102.5.

105.    Defendants also retaliated against BRYANT by, among other things: (a) refusing to allow BRYANT to vote on her removal from the BGC Board and her termination as CEO despite having a clear contractual right to participate in the vote; (b) denying BRYANT her statutory COBRA and Cal-COBRA insurance benefits; (c) improperly distributing BRYANT's vacation benefits upon her termination, (d) refusal to return BRYANT's personal effects from her offices in New York and California, and (e) filing a frivolous federal lawsuit against her, forcing her to incur substantial attorneys' fees.

106.    Defendants illegal conduct was a direct and proximate cause of damage, injuries and harm to BRYANT, including, but not limited to economic and financial diminishment, pain, anxiety, mental and emotional distress, fear, humiliation, damage to self-image, damage to career, inconvenience, and suffering.

Wherefore, Plaintiff prays judgment as hereinafter set forth.

**FIFTH CAUSE OF ACTION**
**NEGLIGENCE PER SE**
(*Against All Defendants*)

107.    BRYANT incorporates the allegations asserted above and re-alleges them as though repeated in full in this Cause of Action.

108.    Defendants, and each of them are negligent per se on account of violating statutory law. Defendant WELLS FARGO violated BRYANT'S privacy as provided her under the Right to Financial Privacy Act (RFPA), 12 U.S.C.S. § 3401 et seq., by breaching contractual obligations to Plaintiff in transferring BRYANT's bank account to the BGC Defendants. The RFPA prohibits the disclosure of records of a customer of a financial institution. Customers are defined as persons using the institution's

services and is limited to individuals or a partnership of fewer than five individuals. 12 U.S.C. § 3401(4) and (5).

109.    Defendants' illegal conduct was a direct and proximate cause of damage, injuries and harm to BRYANT, including, but not limited to economic and financial diminishment, pain, anxiety, mental and emotional distress, fear, humiliation, damage to self-image, damage to career, inconvenience, and suffering.

110.    Defendants illegal conduct was intentional, malicious and showed a conscious disregard of the rights and health of BRYANT entitling her to punitive damages against Defendants, and each of them, except BGC.

Wherefore, Plaintiff prays judgment as hereinafter set forth.

**SIXTH CAUSE OF ACTION**
**INTRUSION UPON SECLUSION**
***(Against All Defendants)***

111.    BRYANT incorporates the allegations asserted above and re-alleges them as though repeated in full in this Cause of Action.

112.    DEFENDANTS, and each of them, at all relevant times knew that BRYANT enjoyed and had a constitutionally protected reasonable expectation of privacy in her financial affairs with respect to her BGC Wells Fargo bank account which she had considerably grown for the benefit of BGC's community of Black women.

113.    WELLS FARGO intentionally intruded upon BRYANT's right to financial privacy by fraudulently transferring her Wells Fargo bank account to Defendants BGC and DEFENDANT BGC's intention of breaching BRYANT's privacy elicits liability under this claim. DEFENDANTS' intrusion would be highly offensive to any reasonable person.

114.    DEFENDANTS' illegal conduct was a direct and proximate cause of damage, injuries and harm to BRYANT, including, but not limited to economic and financial diminishment, pain, anxiety, mental and emotional distress, fear, humiliation, damage to self-image, damage to career, inconvenience, and suffering.

115.    Defendants illegal conduct was intentional, malicious and showed a conscious disregard of the rights and health of BRYANT entitling her to punitive damages against Defendants, and each of them except BGC.

Wherefore, Plaintiff prays judgment as hereinafter set forth.

**SEVENTHTH CAUSE OF ACTION**
**CONSPIRACY**
(*Against BGC Defendants*)

116.   BRYANT incorporates the allegations asserted above and re-alleges them as though repeated in full in this Cause of Action.

117.   As the foregoing allegations make plain, DEFENDANTS, and each of them agreed, planned, and took overt acts in furtherance of their conspiracy to transfer BRYANT's Wells Fargo bank account to BGC Defendants.

118.   DEFENDANTS illegal conduct was a direct and proximate cause of damage, injuries and harm to BRYANT, including, but not limited to economic and financial diminishment, pain, anxiety, mental and emotional distress, fear, humiliation, damage to self-image, damage to career, inconvenience, and suffering.

119.   DEFENDANTS illegal conduct was intentional, malicious and showed a conscious disregard of the rights and health of BRYANT entitling her to punitive damages against Defendants, and each of them.

Wherefore, Plaintiff prays judgment as hereinafter set forth.

**EIGHTH CAUSE OF ACTION**
**TORTIOUS INTERFERENCE WITH BUSINESS PROSPECTIVE**
**ECONOMIC RELATIONS**
(*Against BGC Defendants*)

120.   BRYANT incorporates the allegations asserted above and re-alleges them as though repeated in full in this Cause of Action.

121.   BGC DEFENDANTS, and each of them, intentionally interfered with an economic relationship between BRYANT and Wells Fargo resulting in economic harm to BRYANT.

122.   BGC DEFENDANTS' illegal conduct was a direct and proximate cause of damage, injuries and harm to BRYANT, including, but not limited to economic and financial diminishment, pain, anxiety, mental and emotional distress, fear, humiliation, damage to self-image, damage to career, inconvenience, and suffering.

123.   Defendants illegal conduct was intentional, malicious and showed a conscious disregard of the rights and health of BRYANT entitling her to punitive damages against Defendants, and each of

them except BGC.

Wherefore, Plaintiff prays judgment as hereinafter set forth.

## NINTH CAUSE OF ACTION
## TORTIOUS INFERENCE WITH BUSINESS ADVANTAGE
### (*Against BGC Defendants*)

124.    BRYANT incorporates the allegations asserted above and re-alleges them as though repeated in full in this Cause of Action.

125.    BGC DEFENDANTS, and each of them, intentionally interfered with BRYANT's business advantage, causing her economic damage, harm and injuries.

126.    BGC DEFENDANTS illegal conduct was a direct and proximate cause of damage, injuries and harm to BRYANT, including, but not limited to economic and financial diminishment, pain, anxiety, mental and emotional distress, fear, humiliation, damage to self-image, damage to career, inconvenience, and suffering.

127.    BGC DEFENDANTS' illegal conduct was intentional, malicious and showed a conscious disregard of the rights and health of BRYANT entitling her to punitive damages against Defendants, and each of them.

Wherefore, Plaintiff prays judgment as hereinafter set forth.

## TENTH CAUSE OF ACTION
## FAILURE TO PREVENT HARASSMENT AND RETALIATION
### (*Against BGC Defendants*)

128.    PLAINTIFF hereby incorporates herein by this reference all the preceding paragraphs of this complaint as though those allegations are set forth here in full.

129.    California Government Code § 12940(k) makes it an unlawful employment practice for an employer to "fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring." BGC DEFENDANTS, and each of them, violated this provision by, among other things, ignoring BGC's retaliation arising from voicing of her considerable concerns that HILES was engaging in "self-dealing" that was in express violation of State and federal laws, rules and regulations, and that HILES and other Board members were committing waste and mismanagement in their handling of BGC's affairs.

130.    At all times mentioned herein, California Government Code § 12940 was in full force

and effect and establishes that the public policy of the State of California is to protect and safeguard the right and opportunity of all persons to seek and hold employment without fear of termination arising from an employee's right to identify and complain about instances of self-dealing, waste, mismanagement, and other issues that materially affect the operations of an organization or the well-being of its employees.

131.   As a direct and proximate result of BGC DEFENDANTS' wrongful termination of BRYANT as described above, BGC DEFENDANTS have violated California public policy, and BRYANT has suffered general and special damages including, but not limited to economic and financial diminishment, pain, anxiety, mental and emotional distress, fear, humiliation, damage to self-image, damage to career, inconvenience, and suffering.

132.   BGC DEFENDANTS' illegal conduct was a direct and proximate cause of damage, injuries and harm to BRYANT, including, but not limited to pain, anxiety, mental and emotional distress, fear, humiliation, damage to self-image, damage to career, inconvenience, and suffering.

Wherefore, Plaintiff prays judgment as hereinafter set forth.

## ELEVENTH CAUSE OF ACTION
### WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY
#### (*Against BGC Defendants*)

133.   PLAINTIFF hereby incorporates herein by this reference all the preceding paragraphs of this complaint as though those allegations are set forth here in full.

134.   Retaliation against an employee is a violation of public policy as is reflected in common law and statutory law, including Government Code 1105.2, incorporated herein.

135.   Defendant employer, and each Defendant, engaged in unlawful retaliation against BRYANT as hereinabove alleged because BRYANT opposed and refused to participate in illegal conduct that violated state and federal law.

136.   Specifically, BRYANT repeatedly opposed and objected to conflicts of interest Defendants insisted on engaging in. BRYANT even cited the corporations code prohibiting HILES from serving concurrently as treasurer and board chair. Rather than complying with the law, Defendants, and each of them, retaliated against BRYANT by suspending her from the board, removing her from the board, and terminating her employment as CEO of her nonprofit. Defendants engineered a hostile

takeover of the nonprofit BRYANT created.

Wherefore, Plaintiff prays judgment as hereinafter set forth.

## TWELFTH CAUSE OF ACTION
## VIOLATION OF CALIFORNIA CORPORATIONS CODE §5233
### (*Against BGC Defendants*)

137.    PLAINTIFF hereby incorporates herein by this reference all the preceding paragraphs of this complaint as though those allegations are set forth here in full.

138.    Section 5233 of the California Nonprofit Public Benefit Corporation Law defines and prohibits self-dealing transactions. A *self-dealing transaction* is defined as "a transaction to which the corporation is a party and in which one or more of its directors has a material financial interest.

139.    BGC DEFENDANTS, and each of them, individually engaged in, facilitated, acquiesced, and/or intentionally ignored the express self-dealings and conflict of interests undertaken in the course of conducting BGC Board of Director duties, responsibilities and decision making.

140.    BGC DEFENDANTS' illegal conduct was a direct and proximate cause of damage, injuries and harm to BRYANT, including, but not limited to economic and financial diminishment, pain, anxiety, mental and emotional distress, fear, humiliation, damage to self-image, damage to career, inconvenience, and suffering.

141.    Defendants illegal conduct was intentional, malicious and showed a conscious disregard of the rights and health of BRYANT entitling her to punitive damages against Defendants, and each of them except BGC.

Wherefore, Plaintiff prays judgment as hereinafter set forth.

## REQUEST OF ORDER TO SHOW CAUSE
## WHY AN INJUNCTION SHOULD NOT ISSUE
### (*Against BGC Defendants*)

142.    PLAINTIFF hereby incorporates herein by this reference all the preceding paragraphs of this complaint as though those allegations are set forth here in full.

143.    Federal Rule 65, Injunctions and Restraining Orders, provides: (a) preliminary injunction. (1) notice. the court may issue a preliminary injunction only on notice to the adverse party. (2) consolidating the hearing with the trial on the merits. before or after beginning the hearing on a motion for a preliminary injunction, the court may advance the trial on the merits and consolidate it with the

hearing. even when consolidation is not ordered, evidence that is received on the motion and that would be admissible at trial becomes part of the trial record and need not be repeated at trial. but the court must preserve any party's right to a jury trial. (b) temporary restraining order. (1) issuing without notice. the court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if: (a) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition.

144.    DEFENDANTS violated BRYANT's State constitutional rights to privacy that has resulted in wasting and improperly spending donors' funds. On reliable information and belief, since December 2021, BGC Defendants have spent approximately $2,000,000 of BGC donors' funds and continues to do unabatedly without oversight. This Court's intervention is urgently needed to stop the hemorrhaging of BGC donors' funds.

145.    BGC DEFENDANTS' illegal conduct has caused, and is causing irreparable injury, loss and damage to BRYANT, including damage to her reputation and standing in the community. Money damages are insufficient to cure the harms, damages and injuries that BRYANT has suffered and continues to suffer. Injunctive relief is required to restore BRYANT to her positions on the BGC's Board, pending the trial on the merits in this matter. BRYANT will suffer irreparable injury or injuries for which there are no adequate remedies at law for the loss of her position as CEO and president of the non-profit that she created.

146.    It is hereby requested that this Court issue an Order to Show Cause for Defendants to show cause why a permanent injunction should not be issued that would restore BRYANT to her elected employment position as CEO and president of BGC.

Wherefore, Plaintiff prays judgment as hereinafter set forth.

## PUNITIVE DAMAGES

147.    BRYANT hereby incorporates herein by this reference all the preceding paragraphs of this complaint as though those allegations are set forth here in full.

148.    Defendants' acts, as alleged herein, as to all causes of action, were intentional, outrageous, despicable, oppressive, fraudulent, and done with ill will and intent to injure BRYANT and to cause her mental anguish, anxiety, and distress. Defendants' acts were done in conscious disregard of

the risk of severe emotional harm to BRYANT and with the intent to injure, constituting oppression, fraud, and malice under California civil code §3294, that reasonably entitled BRYANT to punitive damages against all defendants except BGC.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, BRYANT prays for relief as follows:

1.   For an Order to Show Cause directed to BGC Defendants to show cause why an injunction should not issues enjoining all BGC board meetings until further order of this Court, as well as require an accounting of all BGC donors' funds;

2.   For general, including pain, anxiety, inconvenience, mental distress, emotional distress, lost of enjoyment of life, humiliation, spiritual injury, fear, discomfort, damage to career, damage to self-image, suffering; and special, direct, compensatory, damages according to proof;

3.   For punitive damages in the amount of $3,000,000,00 against each Defendant, except BGC. or according to proof at trial;

4.   That an order issue directing that Defendants and each of them, render to the court and to the Attorney General a full and complete accounting of the financial activities and condition of BGC from January of 2020 to the present;

5.   For damages resulting from the breaches of fiduciary duty of all Defendants in an amount to be determined following trial;

6.   For attorneys' fees and costs as authorized by law;

7.   A Court ordered permanent removal of Defendants' HILES, BROWN-PHILPOT, WHITES from BGC's Board and to ban them from serving in any fiduciary capacity thereunder, pursuant to Corporations Code section 5223; and

8.   For such other and further relief as the Court deems just and proper.

Dated: February 24, 2023                **LAW OFFICES OF BONNER & BONNER**

                                        /s/ *Charles A. Bonner*
                                        CHARLES A. BONNER
                                        Attorney for Plaintiff